IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ARLENE WILDER, et al.,                    *

     Plaintiffs,                          *

v.                                         *              Civil Action No. GLR-19-2660

JOHNS HOPKINS HEALTH                       *
SYSTEM CORP., et al.,
                                           *
     Defendants.

*****

## MEMORANDUM OPINION

THIS MATTER is before the Court upon Defendants Johns Hopkins Health System Corporation, Howard County General Hospital, Inc., and Digna Pearson's (collectively, "Hospital Defendants") Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 2) and Defendants Sodexo, Inc., Marlon Bivens, Patrice Hanson, and Steve Westgreen's[1] (collectively, "Sodexo Defendants") Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 8). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Motions will be denied and this case will be remanded to state court.

## I.        BACKGROUND[2]

At all times relevant to their Complaint, Plaintiffs Arlene Wilder, Nerlie Desmesyeux, Alicia Thompson, Gina Twine, Jessica Alonge, Donica Crofton, and Beatrice

---

[1] The Court will direct the Clerk to correct the docket to reflect the correct spelling of Defendant Steve Westgreen's name.

[2] Unless otherwise noted, the Court takes the following facts from Plaintiffs' Complaint and accepts them as true.

George[3] were employed as dietary aides at Howard County General Hospital ("HCGH"). (Compl. ¶ 26, ECF No. 3). As dietary aides, Plaintiffs were responsible for answering the phones in the call center (the "Dietary Call Center"),[4] taking meal orders for patients, and ensuring that patients adhered to any dietary restrictions imposed as a result of their health conditions. (Id. ¶ 27).

There was often more than one aide present in the Dietary Call Center at any given time. (Id. ¶ 30). When the aides were not attending to calls or patients' dietary concerns, they would often discuss private and confidential matters with one another. (Id.). On multiple occasions, Plaintiffs discussed their own personal health concerns, the health concerns and complications of their immediate family members, and other personal information while they were present in the Dietary Call Center. (Id. ¶ 31). Plaintiffs "divulged [this information] in confidence" and engaged in these discussions "with the understanding that only the people physically present in the room would be privy to the conversations." (Id. ¶¶ 30, 31).

In July and August 2016, several events occurred that raised Plaintiffs' suspicions that someone might be recording their conversations in the Dietary Call Center without their consent. (Id. ¶ 32). For instance, on one occasion, after seeing that Plaintiff Nerlie

---

[3] Howard County General Hospital states that it has no record of employing an individual named Beatrice George. (Hospital Defs.' Mot. Dismiss Alt. Summ. J. ["Hospital Defs.' Mot."] Ex. 1 ["Oravec Aff."] ¶ 10, ECF No. 2-2).

[4] Throughout their Complaint, Plaintiffs refer to conversations taking place in the "dietary office," the "call center," and the "dietary health office." The Court assumes these phrases refer to the same room, which the Court will refer to as the "Dietary Call Center" for consistency.

Desmesyeux was in possession of medication, Defendant Marlon Bivens, an employee of Defendant Johns Hopkins Health System Corporation ("JHHSC"),[5] told her that she "better go ahead and take those." (Id. ¶¶ 17, 72). When Desmesyeux told Bivens "he didn't know what she was taking," Bivens responded, "Yes I do; birth control pills." (Id.). According to Desmesyeux, there was no reason for Bivens to know that she was on birth control unless he overheard a conversation she had in the Dietary Call Center. (Id.).

Additionally, in July or early August 2016, Plaintiff Alicia Thompson was discussing her son's health complications with Plaintiff Arlene Wilder in the Dietary Call Center when Bivens came to the door and "told them to be careful because even when they are not on the phone, 'they' can hear everything that is being said." (Id. ¶ 83). On another occasion, Bivens told Wilder and Thompson "to remember that 'they' can hear them." (Id. ¶ 84). At the time, Thompson understood "they" to mean those in the management office, which was adjacent to the Dietary Call Center. (Id. ¶ 83). Bivens later asked Thompson "how the weekend trip with her husband went," even though Thompson had not told Bivens about the trip. (Id. ¶ 85). Thompson had, however, told another dietary aide about the trip a few weeks prior. (Id.).

In addition, Wilder's son was undergoing treatment for end-stage cancer throughout 2016, which often required Wilder to "provide information to his physicians regarding his health and medical status" over the phone while she was present in the Dietary Call Center. (Id. ¶ 39). On occasion, Wilder had also discussed her son's condition with another aide in

---

[5] Hospital Defendants assert that Bivens is and was at the times relevant to the Complaint an employee of Sodexo, not JHHSC. (Oravec Aff. ¶ 10).

the Dietary Call Center. (Id. ¶ 43). However, Wilder had not discussed her son's condition with Bivens, nor had she discussed her son's health in any area where Bivens could have overheard. (Id. ¶ 42). Yet in July or early August 2016, Bivens approached Wilder and inquired about her son's health. (Id. ¶ 41). Bivens also asked Wilder about a kidney stone removal surgery she had undergone, which Wilder had discussed with her fellow dietary aides but not with Bivens. (Id. ¶¶ 44, 45). When Wilder asked Bivens how he knew this information, Bivens responded, "We know all of y'alls business." (Id. ¶ 45).

Then, in early August 2016, Defendant Amanda Hillesland, a manager for Defendant Sodexo, Inc. ("Sodexo"), entered the Dietary Call Center and told Wilder that she wanted to discuss a patient's complaint about her. (Id. ¶ 48). Hillesland told Wilder that management had listened to an audio recording of the conversation between Wilder and the patient that was the subject of the complaint. (Id.). Wilder responded that she had not known she was being taped and asked Hillesland why the conversations were being recorded. (Id. ¶ 49). Hillesland then "shook her head, put her finger to her mouth[,] and whispered that they needed to leave the [Dietary Call Center] to have this conversation" because "the microphones are very sensitive and will pick up everything that is said in the room." (Id.). Wilder subsequently informed Desmesyeux that the Dietary Call Center was being recorded. (Id. ¶ 62).

On August 12, 2016, at the request of Wilder and other dietary aides, an "emergency meeting" was held to address the recording that was taking place in the Dietary Call Center.

4

(Id. ¶¶ 33, 50). At the meeting, Plaintiffs were "definitively told that they had been recorded" while in the Dietary Call Center. (Id.).[6]

On August 15, 2016, Wilder noticed a sign posted on the door of the Dietary Call Center stating that phone calls were being recorded. (Id. ¶ 51). The sign did not specify whether conversations held in the Dietary Call Center itself, as opposed to conversations over the call center telephones, would be recorded. (Id.). Additionally, a notice indicating that the phone lines were being recorded was also taped on a computer monitor in the Dietary Call Center. (Id. ¶¶ 34, 65). Once again, this notice did not specify whether the room itself was subject to audio recording. (Id. ¶ 65). A few weeks later, Hillesland provided the dietary aides with a recorded audio message to play at the beginning of calls with patients to let them know that the calls were being recorded for quality assurance purposes. (Id. ¶ 52).

On June 28, 2019, Plaintiffs Arlene Wilder, Nerlie Desmesyeux, Alicia Thompson, Gina Twine, Jessica Alonge, Donica Crofton, and Beatrice George filed a Complaint in the Circuit Court for Baltimore City, Maryland against Hospital Defendants, Sodexo Defendants, Sherman Garland, and Amanda Hillesland.[7] (ECF No. 3). Hospital Defendants removed the action to this Court on September 12, 2019. (ECF No. 1). Plaintiffs' eight-count Complaint alleges: negligence (Count I); intentional infliction of emotional distress

---

[6] Plaintiffs also state, however, that Defendants notified Plaintiffs for the first time on August 15, 2016 that their conversations in the Dietary Call Center were being recorded and that, prior to that date, Plaintiffs were not aware they were being recorded. (Compl. ¶¶ 28, 85).

[7] To date, there is no record that Defendants Sherman Garland and Amanda Hillesland have been properly served.

(Count II); negligent training (Count III); negligent retention (Count IV); negligent supervision (Count V); intentional intrusion upon the seclusion of another (Count VI); gross negligence (Count VII); and violation of Maryland's wire-tap statute, Md. Code Ann., Cts. & Jud. Proc. ["CJP"], § 10-402 (Count VIII). (Compl. ¶¶ 98–142).

On September 12, 2019, Hospital Defendants filed their Motion to Dismiss or, in the Alternative, for Summary Judgment. (ECF No. 2). On September 16, 2019, Sodexo Defendants filed their Motion to Dismiss or, in the Alternative, for Summary Judgment. (ECF No. 8). Plaintiffs filed Oppositions on September 26, 2019 and September 30, 2019. (ECF Nos. 12, 14). Hospital Defendants filed a Reply on October 10, 2020. (ECF No. 15). To date, the Court has no record that Sodexo Defendants filed a Reply.

## II.   DISCUSSION

### A.   Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

## B.    Materials Outside the Pleadings

Hospital Defendants urge the Court to consider the Collective Bargaining Agreement between HCGH and United Food and Commercial Workers, Local 27 (the "CBA" or "Agreement"), which they attach as an exhibit to their Motion to Dismiss. (See ECF No. 2-2).

The general rule is that a court may not consider extrinsic evidence when resolving a Rule 12(b)(6) motion. See Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC, 794 F.Supp.2d 602, 611 (D.Md. 2011). However, a court "may properly take judicial

notice of matters of public record . . . [and] consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Phillips v. Pitt. Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (citing Hall v. Virginia, 385 F.3d 421, 424 (4th Cir. 2004)).

Here, Plaintiffs have not attached the CBA to their Complaint, nor do they make any reference to the CBA therein. Hospital Defendants respond that the CBA is nonetheless integral to the Complaint because, although Plaintiffs' claims are styled as state-law claims, the CBA must be consulted to determine whether Plaintiffs' claims are preempted by federal law. It is well established that plaintiffs may not use artful pleading to "evade the requirements" applicable to interpretation of collective bargaining agreements. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985). Additionally, "[w]hile the well-pleaded complaint rule in general forecloses looking beyond the allegations of the complaint for a federal question to confer jurisdiction, there is an exception for situations where the complaint asserted can be resolved only by referring to the terms of the collective bargaining agreement." Willis v. Reynolds Metals Co., 840 F.2d 254, 255 (4th Cir. 1988). Thus, this Court may take judicial notice of the CBA without converting Defendants' Motions into motions for summary judgment. See Bowman v. Jack Cooper Transport Co., Inc., No. RDB-18-3165, 2019 WL 2744628, at *2 (D.Md. July 1, 2019) (taking judicial notice of collective bargaining agreement attached to defendant's motion to dismiss); see also Gasner v. Cty. of Dinwiddie, 162 F.R.D. 280, 282 (E.D.Va. 1995) ("[W]hen a plaintiff fails to introduce a pertinent document as part of his complaint, the

defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment.").

B.   **Analysis**

1.   **Preemption**

Defendants contend that Plaintiffs' claims are preempted by section 301 of the federal Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, because they require interpretation or application of the CBA to which Plaintiffs were subject at the time of the allegations outlined in the Complaint.

"Section 301 of the LMRA expresses a federal policy, mandated by Congress, that federal law be applied in addressing disputes arising out of labor contracts." Clark v. Newport News Shipbuilding & Dry Dock Co., 937 F.2d 934, 937 (4th Cir. 1991). "Section 301 not only provides federal courts with jurisdiction over employment disputes covered by collective bargaining agreements, but also directs federal courts to fashion a body of federal common law to resolve such disputes." McCormick v. AT&T Techs., Inc., 934 F.2d 531, 534 (4th Cir. 1991) (citing Allis-Chalmers, 471 U.S. at 209). Moreover, "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 23 (1983) (quoting 29 U.S.C. § 185(a)). To that end, a plaintiff may not rely on state law "as an independent source of private rights to enforce collective bargaining contracts." Caterpillar Inc. v. Williams, 482 U.S. 386, 394, (1987) (internal quotation marks and citation omitted).

Preemption under § 301 occurs only when resolution of a state law claim depends upon the meaning of the collective bargaining agreement, see Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405–06 (1988), or when resolution of the state law claim is "inextricably intertwined with consideration of the terms of the labor contract." Allis-Chalmers, 471 U.S. at 213. By contrast, "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Livadas v. Bradshaw, 512 U.S. 107, 124 (1994). Further, § 301 does not "displace entirely state law in the labor relations context." McCormick, 934 F.2d at 535. Rather, "a State may provide [substantive rights] to workers when adjudication of those rights does not depend on the interpretation of [collective bargaining] agreements." Id. (quoting Lingle, 486 U.S. at 409). "Thus, the question in preemption analysis is not whether the source of a cause of action is state law, but whether resolution of the cause of action requires interpretation of a collective bargaining agreement." McCormick, 934 F.2d at 535.

Determining whether resolution of a state cause of action requires interpretation of a collective bargaining agreement depends upon "the legal character of a claim, as independent of rights under the collective bargaining agreement"—"not whether a grievance arising from precisely the same set of facts could be pursued." Livadas, 512 U.S. at 123 (citation and internal quotation marks omitted). Further, "mere parallelism between the facts and issues to be addressed under a state law claim and those to be addressed under § 301 does not render the state-law analysis dependent on the collective bargaining agreement." McCormick, 934 F.2d at 535. Accordingly, "as long as the state-law claim can

be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." Id. (quoting Lingle, 486 U.S. at 409–10). In particular, the Fourth Circuit has reasoned that state law claims are not preempted by § 301 where "the claims involve[] purely factual questions concerning the conduct of the employee and the conduct and motivation of the employer." Owen v. Carpenters' Dist. Council, 161 F.3d 767, 776 (4th Cir. 1998).

When undertaking preemption analysis, courts recognize that a collective bargaining agreement "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." McCormick, 934 F.2d at 536 (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578 (1960). As such, a collective bargaining agreement "consists, in addition to its express provisions, of an 'industrial common law—the practices of the industry and the shop—[which] is equally a part of the collective bargaining agreement although not expressed in it.'" Id. (quoting United Steelworkers, 363 U.S. at 581–82).

In determining whether state-law claims are preempted by § 301, a court "must examine the elements of the state law causes of action advanced by [the plaintiff]" to assess "whether resolution of [the] state law claims requires interpretation of the collective bargaining agreement." McCormick, 934 F.2d at 535; see also Verbal v. Giant of Maryland, LLC, 204 F.Supp.3d 837, 842 (D.Md. 2016) ("Under a proper preemption analysis, therefore, the first step is to recognize the essential elements of the state law tort claims[.]"). Thus, the Court addresses each of Plaintiffs' claims in turn.

### i.     Maryland Wiretap Act (Count VIII)

The Maryland Wiretap Act governs the interception and disclosure of "wire, oral, or electronic communications" and makes it "unlawful for any person" to:

(1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

(2) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or

(3) Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle.

Md. Code Ann., Cts. & Jud. Proc. ["CJP"] § 10-402(a).

Under the Act, oral communications include "any conversation or words spoken to or by any person in a private conversation." Id. § 10-401(13)(i). Maryland courts interpret the word "private" to mean conversations in which the participants have "a reasonable expectation of privacy." Agnew v. State, 197 A.3d 27, 34–35 (Md. 2018). Thus, "the protections afforded by the Wiretap Act offer shelter to those who do not consent to the interception of their private conversations, thereby maintaining a reasonable expectation of privacy in their conversations." Id. at 33.

Neither party identifies case law from the District of Maryland or the Fourth Circuit that squarely addresses whether state wiretap claims are preempted by § 301 of the LMRA.[8]

---

[8] Defendants do cite, however, three district court cases in support of their argument: Hogue v. Holmes, No. CIV. 93-364-JD, 1994 WL 258546 (D.N.H. Feb. 22, 1994); Panayi

In the absence of such cases, the Court looks to the Third Circuit's holding in Kline v. Security Guards, Inc., 386 F.3d 246 (3d Cir. 2004), which is highly relevant here. In Kline, the court considered whether plaintiff's claims under the Pennsylvania wiretap statute required interpretation of the general "management rights clause" of the parties' collective bargaining agreement. Id. at 256–57. Importantly, like the Maryland law, the Pennsylvania wiretap statute requires the speaker to possess a reasonable expectation of privacy in the conversion. Id. at 257. The Third Circuit concluded that assessing the plaintiffs' wiretap claims did not require the court to interpret the collective bargaining agreement because the agreement itself "ma[de] no mention of the use of video cameras, microphones, or other surveillance of any kind," defendants did "not point to any specific provision of [the agreement] that must be interpreted," and the plaintiffs' privacy expectations could be determined simply by considering the employer's conduct and the circumstances surrounding the workplace. Id. at 256–58. In all, the Kline court reasoned that a finding of preemption under § 301 is not mandated where the plaintiffs' claims merely relate to a topic that is contemplated by the collective bargaining agreement; rather, the "dispositive question" is whether the state claims "require any interpretation of a provision of the [agreement]." Id. at 256.

---

v. N. Ind. Pub. Serv. Co., 109 F.Supp.2d 1012 (N.D.Ind. 2000); and Binkley v. Loughran, 714 F.Supp. 768 (M.D.N.C. 1998). Each of these cases is more than twenty years old, and the law surrounding preemption under § 301 of the LMRA has developed significantly since then. Moreover, these cases are merely persuasive, and their holdings are not binding on this Court.

Defendants argue that the Court cannot determine whether Plaintiffs had a reasonable expectation of privacy as to their conversations in the Dietary Call Center without interpreting § 3.1 of the CBA, which pertains to "Management Functions." This section authorizes HCGH "to control and regulate the use of facilities, equipment, and other property of the Hospital; to introduce new . . . equipment;" "and to take whatever action is either necessary or advisable in the Hospital's sole judgment and discretion to foster patient care and otherwise . . . fulfill the mission of the Hospital and to direct the Hospital's employees," among other things. (Hospital Defs.' Mot. Dismiss Alt. Summ. J. ["Hospital Defs.' Mot."] Ex. 2 ["Collective Bargaining Agreement"] § 3.1, ECF No. 2-2). Defendants state that § 3.1, as a "management rights clause," also applies generally to the conditions of employment for union employees. According to Defendants, Plaintiffs' use of the internal telephone system to answer calls from patients and the monitoring of those calls by HCGH for quality assurance purposes plainly fall within Plaintiffs' conditions of employment. Thus, as Defendants' argument goes, the Court cannot determine whether Plaintiffs had a reasonable expectation of privacy without analyzing whether HCGH had the authority to monitor and record Plaintiffs' communications pursuant to the CBA.

Consistent with the reasoning in Kline, we disagree with Defendants' contention that Plaintiffs' reasonable expectations of privacy cannot be determined without interpreting the CBA. Although Defendants assert that Plaintiffs' wiretap claim relates to HCGH's right to establish workplace conditions under § 3.1 of the CBA, this section makes no mention of privacy in the workplace, surveillance, or telephone use. Moreover, Defendants do not point to any specific term or phrase in the Agreement that the Court

must interpret in order to resolve Plaintiffs' claim. Thus, while it appears that Plaintiffs' state wiretap claim may relate to a subject contemplated by the CBA, resolution of this claim does not require any actual interpretation of the Agreement. See Kline, 386 F.3d at 256. And indeed, "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Livadas, 512 U.S. at 124.

Defendants also contend that the Court cannot evaluate whether Plaintiffs had a reasonable expectation of privacy without determining if Plaintiffs consented to workplace surveillance under the CBA. Of course, it is not a violation of the Wiretap Act "for a person to intercept a wire, oral, or electronic communication where the person is a party to the communication and where all of the parties to the communication have given prior consent to the interception." CJP § 10-402(c)(3). On this point, Defendants submit, without any apparent basis, that Plaintiffs' union representative "may have bargained away Plaintiffs' statutory protection by giving consent to surveillance in the workplace." (Hospital Defs.' Mot. at 18). According to Defendants, interpretation of the CBA is required to determine if the Union consented to recording on behalf of its members, in which case recording Plaintiffs' conversations without their knowledge would not violate the Maryland Wiretap Act.

As a preliminary matter, the argument that a union representative consented to surveillance as part of the CBA may be foreclosed by § 21.2 of the CBA, which provides that "[t]his Agreement expressly supersedes any practices, understandings and agreements not specifically provided for and incorporated in the Agreement." And even if the Court

were to entertain Defendants' unsubstantiated assertion, it would nonetheless be insufficient to find that Plaintiffs' wiretap claim is preempted under the LMRA. Determining whether the Union consented to workplace surveillance on behalf of its members would require, at most, consultation of parole evidence relating to negotiations of the CBA—it would not require the Court to interpret any provision of the CBA itself. Moreover, Plaintiffs' expectations of privacy here are not dependent on any language in the CBA, and can instead be determined by considering the conduct of Plaintiffs and HCGH as well as the facts and circumstances surrounding the Dietary Call Center. See Kline, 386 F.3d at 256. Because it is not necessary to interpret the CBA in order to determine whether Plaintiffs had a reasonable expectation of privacy in their workplace, the Court finds that Plaintiffs' wiretap claim is not preempted by § 301 of the LMRA.

### ii.   Intentional Intrusion Upon the Seclusion of Another (Count VI)

Maryland defines the tort of invasion of privacy as "[t]he intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." Furman v. Sheppard, 744 A.2d 583, 585 (Md.Ct.Spec.App. 2000). Like claims under the Maryland Wiretap Act, a claim for intentional intrusion upon the seclusion of another requires a showing that the individual had a reasonable expectation of privacy in their communications. See Trundle v. Homeside Lending, Inc., 162 F.Supp.2d 396, 401 (D.Md. 2001).

Defendants argue that the Fourth Circuit's decision in Kirby v. Allegheny Beverage Corp., 811 F.2d 253 (4th Cir. 1987), supports a determination that Plaintiffs' invasion of privacy claim is preempted by § 301 of the LMRA. The plaintiff in Kirby brought a state

16

law invasion of privacy claim against his employer after he was forced to submit to a search of his person and then forced to resign after he refused to submit to a search of his automobile. Id. at 256. The employer removed the case to federal court and argued that the plaintiff's claims were preempted by § 301. Id. The Fourth Circuit agreed, finding that the plaintiff could have refused to submit to the searches, then challenged his termination under the grievance procedures outlined in the collective bargaining agreement. Id. According to the court, "the availability of remedies under the labor contract precludes [plaintiff's] pursuit of those remedies in a state law tort action." Id.

Four months after the Fourth Circuit's decision in Kirby, however, the Supreme Court held in Caterpillar, Inc. v. Williams, 482 U.S. 386 (1987), that an employee may vindicate his interests either by seeking a remedy under a collective bargaining agreement or by bringing a state court action, as long as the state law action does not require interpretation of the collective bargaining agreement. Id. at 394–95. Thus, after Caterpillar, the fact that a plaintiff could pursue a remedy for invasion of privacy under the collective bargaining agreement does not preclude a state tort action brought to vindicate the same interests. See Kline, 386 F.3d at 258 (noting that "Kirby's holding . . . did not survive Caterpillar"). Accordingly, Kirby is not dispositive of Plaintiffs' invasion of privacy claim.

Instead, the Court finds that interpretation of the CBA is not required in order to resolve Plaintiffs' invasion of privacy claim. As discussed above, a court can determine whether Plaintiffs possessed a reasonable expectation of privacy in the Dietary Call Center by looking at the attendant facts and circumstances and the conduct of the parties involved. Moreover, determining whether the alleged intrusion is "highly offensive to a reasonable

17

person" requires no reference to the text of the CBA. As such, the Court finds that Plaintiffs' invasion of privacy claim is not preempted by § 301 of the LMRA.

### iii.   Negligence Claims (Counts I–V)

To succeed on a negligence claim, a plaintiff must prove four well-established elements: (1) the defendant was under a duty to protect the plaintiff from injury; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury or loss; and (4) the loss or injury proximately resulted from the defendant's breach of the duty. Wash. Metro. Area Transit Auth. v. Seymour, 874 A.2d 973, 976 (Md. 2005). Claims for negligent hiring, retention, and supervision generally require the following five elements: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring, training, or supervising the employee. See Williams v. Wicomico Cty. Bd. of Educ., 836 F.Supp.2d 387, 400 (D.Md. 2011).

In general, state tort claims are preempted where reference to a collective bargaining agreement is necessary to determine whether a "duty of care" exists or to define "the nature and scope of that duty, that is, whether, and to what extent, the [employer's] duty extended to the particular responsibilities alleged by [the employee] in h[is] complaint." McCormick, 934 F.2d at 536 (quoting Electrical Workers (IBEW) v. Hechler, 481 U.S. 851, 862 (1987)). Defendants contend that Plaintiffs' claims for negligence and negligent hiring, retention, and supervision cannot be resolved without reference to § 3.1 of the CBA, which they argue affords HCGH broad authority in controlling the terms and conditions of Plaintiffs'

employment. Specifically, Defendants assert that Plaintiffs' negligence claims require interpretation of the CBA "because any duty that may have been owed by [Defendants] to Plaintiffs arises solely from the CBA." (Hospital Defs.' Mot. at 22).

In their Complaint, however, Plaintiffs allege that "Defendants owed a duty of care to Plaintiffs to only record them with their knowledge or consent." (Compl. ¶ 99). Additionally, Plaintiffs state that Defendants failed to exercise their duty to "provide [sufficient] training," "terminate unfit employees," and "properly supervise supervisory employees" in order "to prevent the unlawful and negligent recording of Plaintiffs." (Id. ¶¶ 110, 116, 122). Plaintiffs clearly allege that the duty of care Defendants owed them arises from state law and is therefore independent from the CBA. As such, reference to the CBA is not required to determine whether Defendants owed Plaintiffs a duty of care or to define the scope of that duty. Plaintiffs' negligence claims are therefore not preempted by § 301 of the LMRA.

### iv.    Intentional Infliction of Emotional Distress & Gross Negligence (Counts II, VII)

Four elements are essential to state a claim for intentional infliction of emotional distress in Maryland: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. See Harris v. Jones, 380 A.2d 611, 614 (Md. 1977). Additionally, the context of an employment relationship, with its inherent opportunities for abuse of authority, "is a factor to be considered when analyzing whether an employer's behavior was so outrageous that he or

she has committed the tort of intentional infliction of emotional distress." Ky. Fried
Chicken Nat'l Mgmt. Co. v. Weathersby, 607 A.2d 8, 15 (Md. 1992). As for gross
negligence, this tort involves "an intentional failure to perform a manifest duty in reckless
disregard of the consequences as affecting the life of another." Marriott Corp. v.
Chesapeake & Potomac Tel. Co. of Md., 723 A.2d 454, 462 (Md.Ct.Spec.App. 1998).

Defendants argue that determining whether their conduct was wrongful cannot be
done in a vacuum, but rather requires a consideration of the contractual circumstances
embodied in the CBA. The Court is not persuaded. At bottom, reference to the CBA is not
necessary to determine whether Defendants' conduct was extreme and outrageous or
reckless. Their alleged conduct—i.e., recording Plaintiffs' private conversations without
their consent—could be considered extreme, outrageous, or reckless regardless of whether
it was somehow implicitly authorized by the CBA. In other words, Defendants' actions
here are allegedly wrongful not because of a duty of care created or defined by the terms
of the CBA, but because of principles of state law. See Jackson v. Kimel, 992 F.2d 1318,
1326 (4th Cir. 1993) (finding that intentional infliction of emotional distress claim was not
preempted under § 301 where interpretation of the collective bargaining agreement was
not necessary to determine whether defendant owed a duty to refrain from the alleged
conduct). As such, Plaintiffs' claims for intentional infliction of emotional distress and
gross negligence are not preempted by § 301 of the LMRA.

### 2.    Removal

Hospital Defendants removed this action to the United States District Court for the
District of Maryland on September 12, 2019. (ECF No. 1). As grounds for removal,

Hospital Defendants stated that the Court has subject matter jurisdiction over this action based upon federal question jurisdiction because Plaintiffs' claims are preempted by § 301 of the LMRA. (Not. Removal ¶ 6, ECF No. 1). Having found that Plaintiffs' claims are, in fact, not preempted by the LMRA, the Court must evaluate whether it retains subject matter jurisdiction over this case.

Under 28 U.S.C. § 1441(a), a defendant may remove any civil action to federal court if the plaintiff's complaint presents a federal question, such as a federal cause of action. See Caterpillar, 482 U.S. at 392. Federal question jurisdiction is determined by the "well-pleaded complaint" rule, which provides that the federal question must be "presented on the face of the plaintiff's properly pleaded complaint" to confer jurisdiction, id., and the plaintiff "may avoid federal jurisdiction by relying exclusively on state law." Childers v. Chesapeake & Potomac Tel. Co., 881 F.2d 1259, 1261 (4th Cir. 1989). Importantly, however, there exists a class of cases where the preemptive force of a statute is so "extraordinary" that any claim based on preempted state law is considered a claim arising under federal law. Owen, 161 F.3d at 772 (citing Childers, 881 F.2d at 1261). This "complete preemption" corollary to the "well-pleaded complaint" rule applies to claims under § 301 of the LMRA. Id. (quoting Childers, 881 F.2d at 1261–62). In effect, the application of complete preemption "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Id. (quoting Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987)). Accordingly, where a plaintiff's state law claim is preempted by § 301 of the LMRA, the action may be removed

to federal court even though the plaintiff's complaint does not include a federal cause of action. Id. (citing Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 258–64 (1994)).

Because Plaintiffs' state law claims are not preempted by § 301 of the LMRA, the Court cannot construe Plaintiffs' complaint as one that states a federal claim. The Complaint does not otherwise include a federal cause of action; therefore, the Court lacks subject matter jurisdiction over this matter. As such, this case will be remanded to state court.

### III.   CONCLUSION

For the foregoing reasons, Hospital Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 2) and Sodexo Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 8) will be denied. A separate Order follows.

Entered this 29th day of September, 2020.


_____/s/_____
George L. Russell, III
United States District Judge